1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   MICHAEL PEACE,                          Case No. 21-cv-01227-SI (PR)

                    Plaintiff,
8                                           **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'**
9       v.                                  **MOTION FOR SUMMARY JUDGMENT;
                                            ADDRESSING PLAINTIFF'S PENDING**
10  DEPUTY HARRY WU, et al.,                **MOTION; AND REFERRING MATTER
                                            TO *PRO SE* PRISONER MEDIATION**
11                  Defendants.             **PROGRAM**

12                                          Re: Dkt. Nos. 17, 23

13          Plaintiff Michael Peace, who is currently incarcerated at the San Francisco County Jail, filed

14  a *pro se* civil rights action pursuant to 42 U.S.C. § 1983.  Dkt. No. 1.  He seeks monetary damages.

15  *Id*. at 3.[1]  In his complaint, Peace named the San Francisco Sheriff's Office ("SFSO") and the

16  following defendants from SFSO: Deputy Harry Wu (#2332) and Captain Stephen Tilton.  *Id*. at 1.

17          This action is now before the court for consideration of the motion for summary judgment

18  filed by defendants and opposed by Peace.[2]  For the reasons discussed below, summary judgment

19  will be granted in part and denied in part.  The case will be referred to the *Pro Se* Prisoner Mediation

20  Program.

21

22  _____

    [1]  Page number citations refer to those assigned by the court's electronic case management filing
23  system and not those assigned by the parties.

24  [2]  The court notes that Peace's opposition was due on February 28, 2022.  That deadline passed.
    Peace filed his opposition six months later—on August 1, 2022, *see* Dkt. No. 22, along with a
25  "Motion to Reconsider," in which he explains that he "ha[s] not gotten any response from prisoner
    legal services" about "how [to] respond to summary judgment . . . [and] that[']s the reason why [he]
26  is asking the courts to please reconsider the order on summary judgment," *see* Dkt. No. 23 at 2.
    Because at the time his motion was filed the court had not yet ruled on the pending motion for
27  summary judgment, Peace's "Motion to Reconsider" is DENIED as premature.  To the extent that
    Peace's motion can be construed as a request for an extension of time to file his opposition, such a
28  request is GRANTED.  The time in which Peace may file his opposition will be extended *nunc pro
    tunc* to August 1, 2022, the date that his opposition was filed.

United States District Court
Northern District of California

United States District Court
Northern District of California

## BACKGROUND

The events and omissions giving rise to this action occurred on May 15, 2020 at the San Francisco County Jail in San Bruno, California.  Peace alleges two claims in his complaint.  First, he alleges that Deputy Wu used excessive force during handcuffing.  Second, Peace alleges that he was disciplined for the May 15, 2020 incident, and Captain Tilton violated his right to due process by causing him to be put in disciplinary housing without a sufficient evidentiary basis.  Peace seeks monetary damages.

A.    Parties

At the relevant time, Peace was housed in the jail as a pretrial detainee.[3]  Also at the relevant time, Deputy Wu was a San Francisco Sheriff's deputy and Captain Tilton was a San Francisco Sheriff's captain, and both were stationed at the jail.

B.    Peace's Version

The following background is taken from the court's April 26, 2021 Order, which summarizes the claims from his complaint and states as follows:

> At about 7:35 a.m. Deputy Wu woke up Peace and his cellmate, telling them that it was time for their "walk time"; Peace tried to explain that their "walk time" was during the swing shift.  Docket No. 1 at 4.  Deputy Wu said he would look into the matter and Peace went back to sleep.  Peace was woken up again at 11:30 a.m. by Deputy Wu announcing over the intercom that it was time for their "walk time."  Peace and his cellmates exited the cell and tried to explain that their group walked on the next shift; Deputy Wu told them to shut up and walk.  Peace tried to talk to another deputy, which led Wu to approach and argue with him before telling Peace to shut up and "take it in the house." *Id.*  Deputy Wu eventually told Peace to cuff-up.  As soon as Peace turned around to cuff-up, Deputy Wu jumped on his back and put him in a head-lock. *Id.* at 5.  Deputy Wu "wrestled [Peace] around which made [them] slam into the metal sink and wall," even though Peace was attempting to allow himself to be handcuffed. *Id.*
>
> Peace was taken to an interview room where he talked to captain Tilton and tried to explain what had happened.  Captain Tilton told

---

[3] As of August 1, 2022, Peace states he is still a pretrial detainee.  Dkt. 23 at 1.

him that if there was any truth to what Peace was saying, he (Tilton) would see it on the pod's camera and would review it. *Id.* Even though a deputy explained that what Peace said was true, captain "Tilton still let his deput[ies] send [Peace] to the hold for 30 days with loss of all [his] privileges." *Id.* at 3. Peace thus lost canteen, phone privileges, and "walk time" for 30 days. *Id.* at 5. Also, a new charge was filed against him but later was dropped at the first court appearance. *Id.*

Dkt. 3 at 1-2 (citing Dkt. No. 1 at 4-5).[4]

The complaint does not indicate whether Peace sustained any emotional, mental or physical injuries as a result of the alleged excessive force used by Deputy Wu. *See* Dkt. No. 1. However, in his deposition, Peace testified he suffered the following injuries: a bite to the inside of his lip which caused pain for "probably" a week, and pain in his back treated by mild pain relievers which is now resolved; and otherwise he was "okay." Schroeder Decl., Ex. C (Peace's Dep.) at 55:11-58:7, 60:8-61:1. Peace also alleges he experienced anger and missed the opportunity to talk to his children during the thirty days of discipline in which he was not allowed phone privileges after the incident. *Id.* at 61:2-12.

Peace claims that he exhausted his administrative remedies as to the claims in his complaint by filing "four different grievances" "all pertaining to what happened" on May 15, 2020. *Id.* at 70:16, 71: 11-13. Peace wrote the "first one after the incident happened." *Id.* at 70:17-18. He claims that he "turned it into the pod deputy who was in the pod at the time." *Id.* at 72:22-23. He claims that "six or seven days after [he] wrote the first one, they . . . rebooked [him] … [and] charged [him] . . . [with] charges pertaining to what happened." *Id.* at 70: 20-24. He adds as follows:

> on the second or the third [grievance] . . . since it . . . was supposed to be a criminal matter now. This was before I even did any lawsuit or anything like that. Since it's going to be a criminal matter, I asked in

---

[4] In his deposition, Peace adds that "when they did get me to the interview room, the slamming on the floor and putting me in the corner and making me slam by nose against the corner of the—the corner of the wall." *See* Schroeder Decl., Ex. C at 51:10-13. However, such an allegation of this use of excessive force in the interview room is nowhere in either Peace's complaint or opposition. *See* Dkt. Nos. 1, 22. Peace also seems to contradict himself in his complaint by stating "when back up was called it was no further problems," Dkt. No. 1 at 5, and in his response to defendants' request for documents, which states: "After slam[m]ing [me] into the sink in the pod, back up was called and I was then cuffed with no further problems," Dkt. No. 17-19 at 5. Thus, the court need not discuss this additional claim, which again was only raised at his deposition. The scope of the action is defined by the operative pleading, which in this case is the complaint. The court will not grant Peace further leave to amend to plead a new excessive force claim at this late date.

> that grievance that the tapes from the incident, everything be held, be put up since this is a criminal matter, since charges have been filed on me.
>
> Then since no grievances was being answered, I'm going to say I wrote another grievance based on I wasn't getting no responses to the grievances that I wrote.

*Id.* at 71:18 - 72:5.[5]  Peace states that he "got a response to one of [his grievances]," and "nothing ever happened after that." *Id.* at 74:20-22.  Peace is not sure for which grievance he got a response. *Id.* at 74:23-24.  Peace elaborates more about the response to that one grievance in his complaint, stating as follows: ". . . I have only got[ten] a reply to one [grievance], which Captain Tilton said he talked to his deputy about his behavior.  I appealed but still have not got[ten] a response almost a year later." Dkt. No. 1 at 1.


C.   Defendants' Version

In the motion for summary judgment, defendants' counsel has outlined defendants' involvement with Peace's excessive force and due process claims.  *See* Dkt. No. 17 at 8-16.  The court includes defendants' version below, which summarizes pertinent facts in support of their motion for summary judgment and includes various declarations, Peace's medical records from the San Francisco Public Health Department, the security footage from the date and time of the incident from SFSO county jail, incident reports from the date and time of the incident, portions of Peace's deposition, and his responses to defendants' discovery requests. Dkt. Nos. 17-2 - 17-26.

First, defendants outline Peace's allegations from the May 15, 2020 incident.  *See* Dkt. No. 17 at 8-9.  Then, they discuss the two different videos taken from the date and time of the incident, each showing a different angle.  *Id*. at 10-12.  Defendants describe the resulting injuries Peace sustained from the incident, as testified to in Peace's deposition.  *Id*. at 12-13.  Next, they explain that Peace was disciplined for the incident and was provided a pre-disciplinary hearing, which they allege was constitutionally adequate.  *Id*. at 13-15.  Lastly, they discuss Peace's allegations relating to his grievances, SFSO's grievance process, and the results of SFSO's search for grievances or

---

[5] As mentioned below, any charges stemming from the May 15, 2020 incident were later dropped at the first court appearance.  *Id*.; *see also* Wu Decl. ¶ 12, Ex. D (Charges).

appeals filed by Peace for 2020.  *Id*. at 15-16.

        1.  <u>The May 15, 2020 Incident</u>

        a.  <u>Peace's Allegations</u>

On May 15, 2020, Peace alleges that Deputy Wu used excessive force when cuffing him and that Captain Tilton violated Peace's due process rights by placing him in disciplinary housing without an evidentiary basis.  Dkt. No. 1.  These claims stem from an incident in San Francisco County Jail #3 ("CJ-3"), which was known at the time of the incident as San Francisco County Jail #5, and is managed by SFSO.  *See id.*  Peace was a pretrial detainee at the time.  Dkt. No. 3 at 1; *see also* Schroeder Decl., Ex. C at 16:11-13.  He had been an inmate at the jail since September 15, 2017, awaiting trial on multiple charges.  *Id*. at 16:4-10.

On May 15, 2020, Peace was housed in a cell in Pod 2B, an administrative segregation unit.  *Id*. at 21:4-7; Wu Decl. ¶ 4.  These events occurred approximately two months after the initial lockdown due to the pandemic, and SFSO was working on a daily basis to prevent an outbreak.  Tilton Decl. ¶ 4; Wu Decl. ¶ 4.

        b.  <u>The Incident Based on the Video Recordings, Wu's Declaration, and Peace's Deposition</u>

The security video from CJ-3 during the date and time of the incident, taken from cameras showing two different angles, shows Peace's interactions with Deputy Wu and Deputy Corey King, a non-party who was also involved in the incident (*see* King Decl. ¶ 4).  Ramirez Decl., Ex. A: Camera 152, 11:14:15-11:15:40; and Ex. B: Camera 155, 11:14:16-11:15:40.  Peace has viewed the video and acknowledged they are videos of the incident at issue in this lawsuit.  Schroeder Decl., Ex. C at 75:16-76:6; and E (Acknowledgement Letter).  Specifically, the two videos, which have no sound, show this sequence of events: Peace leaves his cell and walks to the phones in Pod 2B.  Ramirez Decl., Ex. A: Camera 152, 11:14:15-11:14:27.  Deputy Wu, at the podium, stands up.  *Id*.; Ex. B: Camera 155, 11:14:16; *see also* Schroeder Decl., Ex. C at 36:11-14.

Peace turns his back on Deputy Wu the first time.  Deputy Wu walks off the podium towards

United States District Court
Northern District of California

Peace and the phones, Deputy King enters the Pod 2B day room through a door behind the podium and Peace turns around and walks towards Deputy Wu.  Ramirez Decl., Ex. A: Camera 152, 11:14:17-11:14:29; and Ex. B: Camera 155, 11:14:16-11:14:24.  Deputy Wu and Peace are facing each other and can be seen talking when Peace then turns around for the first time and walks away from Deputy Wu and towards the phones.  *Id.*; Ex. A: Camera 152, 11:14:35-11:14:39; and Ex. B: Camera 155, 11:14:31-11:14:38.  Deputy Wu follows Peace a few steps in the direction of the phones, when Peace turns around and faces Deputy Wu again; they are talking again with Deputy Wu moving his arms and hands and Peace swaying back and forth slightly.  *Id.*; Ex. A: Camera 152, 11:14:40-11:14:47; and Ex. B: Camera 155, 11:14:39-11:14:47.  At this time, Deputy King comes off the podium and walks around towards Deputy Wu and Peace; Deputy King is putting his gloves on.  *Id.*; Ex. B: Camera 155, 11:14:43-11:14:47; *see also* Schroeder Decl., Ex. C at 39:5-11.

Because there is no sound in the video, Peace's complaint and testimony at his deposition support that at this time, Deputy Wu told Peace to return to his cell.  Dkt. No. 1 at 4; *see also* Schroeder Decl., Ex. C at 36:11-20.  Peace also testified that both he and Deputy Wu were using obscene language during their interaction.  Schroeder Decl., Ex. C at 36:24-37:20, 47:11-19.  Peace was familiar with the Inmate Rules of Conduct and knew they applied to him while in jail, including the rules that he should not use obscene language and should always obey a direct order.  *Id.* 47:5-16, 89:11-93:7; *see also* Wu Decl., Ex. A (Inmate Rules of Conduct).

Peace turns away again from Deputy Wu (a second time) and takes a step or two towards the phones and then turns around again as the two continue to talk with Deputy King approaching; then Peace turns away again from Deputy Wu (a third time) towards the phones and takes at least one step away when Deputy Wu reaches forward.  Ramirez Decl., Ex. A: Camera 152, 11:14:47-11:14:54; and Ex. B: Camera 155, 11:14:47-11:14:54; *see also* Schroeder Decl., Ex. C at 39:5-25, 40:14-43:23.

A struggle ensues between Peace and Deputy Wu as Deputy King approaches Peace from the back, and the three men are seen struggling as they move or fall towards sinks against the wall.  Ramirez Decl., Ex. A: Camera 152, 11:14:54-11:15:40; and Ex. B: Camera 155, 11:14:54-11:15:40; *see also* Schroeder Decl., Ex. C at 44:6-50:19, 119:12-24 ("So initially when he grabbed me and

United States District Court
Northern District of California

tried to put me in a headlock, he was going to the ground; but my body wouldn't let—my body is the one gets it. My body just tensed up. My body didn't let him. It didn't—I didn't fall"). Peace testified that other inmates in their cells were shouting encouragement to him. Schroeder Decl., Ex. C at 63:20-64:2, 64:24-66:15 ("because the pod was telling me to kick his ass, I mean."); *see also* Wu Decl. ¶ 9.

Other inmates approach the deputies, who were struggling with Peace. During the struggle, two inmates in the Pod day room begin to walk towards the struggling men; Deputy Wu, Deputy King and Peace pull up from the sinks; the inmates do not back away until a third deputy is seen running in. Ramirez Decl. Ex. A: Camera 152, 11:15:08-11:15:28; and Ex. B: Camera 155, 11:15:08-11:15:28. Near or about this time, Deputy King sought assistance, broadcasting via radio, "Deputy assistance needed 2B." Wu Decl. ¶ 9, Ex. B (Incident Report) at 2.

According to Deputy Wu's declaration, during the time Deputy King sought assistance, "other inmates were shouting and encouraging [Peace] to resist being handcuffed . . . [and] [b]ased on [Deputy Wu's] experience and training, [he] believed the shouting was encouraging [Peace] to increase his efforts to resist my orders and handcuffing." Wu Decl. ¶ 9. Wu then describes the struggle between him and Peace, stating as follows:

> I attempted to wrestle [Peace] to the ground, but [Peace] is heavier and taller than I am, which made it difficult. I felt [Peace] overpowering me, so I attempted to adjust [m]y wrap of [Peace's] body but my arms ended up around [Peace's] head, placing him inadvertently in a headlock. However, due to the security risk I perceived, I maintained this position until Deputy King assisted me. Deputy King was able to control [Peace's] right arm and I transitioned into controlling [Peace's] left arm.

*Id.* ¶ 10. Deputy Wu and Deputy King handcuff Peace, a third deputy has approached them, all three deputies escort Peace off camera and into the interview room as other deputies motion to inmates in the day room, and those inmates move back against the perimeter of the day room where the cell doors are located. Ramirez Decl., Ex. A: Camera 152, 11:15:31-11:15:59; and Ex. B: Camera 155, 11:15:42-11:16:12. As Peace is escorted to the interview room, a total of twenty uniformed SFSO officers enter the Pod 2B day room in less than a span of one minute. Ramirez Decl., Ex. B: Camera 155, 11:15:25-11:16:20.

United States District Court
Northern District of California

c.  Peace's Injuries

In his complaint, Peace does not allege emotional, mental, or physical injuries, only that he and his rights were "violated" and that he would like to be "compensated financially for what [he] went through" and that his stay in jail "has been a rough one from the day this all happened."  Dkt. No. 1 at 3, 5.

In deposition, Peace testified that he suffered two physical injuries.  First, he testified that he bit his lip.  Schroeder Decl., Ex. C at 56:2-22; 57:9-10.  Peace declined medical attention and indicated a few days later that he was okay.  *Id*. at 55:22-56:1, 57:7-10 ("The lip lasted for a week probably before I started healing and I can eat without burning.").  In the next several months, Peace's jail medical records contain three entries regarding the lip injury which show Peace declined treatment.  *See* Costello Decl., Ex. A (Medical Records) at 13-15 (declining treatment for lip and stating he was "okay").

Second, Peace testified in his deposition that the May 15, 2020 incident triggered pain from a prior back injury, which was treated with Tylenol, Motrin, and physical therapy and is now resolved.  Schroeder Decl., Ex. C at 56:2-22, 57:11-58:7, 17-59:13, 60:11-61:1.  Peace's jail medical records contain no entries about back pain for the next several months. Costello Decl., Ex. A at 1-62; *see also* Schroeder Decl., Ex. D (Peace's Responses to Discovery) at 14-15 (describing injuries).

2.  The Pre-Disciplinary Hearing

After the May 15, 2020 incident, Peace received a write up of the request for discipline ("RFD") as to his (and other inmates involved) violation of the rule that "[e]ach inmate shall obey all direct orders," which was prepared by Deputies Wu and King.  Schroeder Decl., Ex. C at 67:4-68:4; Wu Decl. ¶ 12, Ex. C; Collins Decl., Ex. B at CCSF-PEACE_000016-17.  When the write up was presented to Peace, he was given "a chance to explain [his] side" and he met with Lt. James Shannon, who asked Peace what happened.  Schroeder Decl., Ex. C at 68:20-22; 69:2-6; 116:10-25. Peace testified that two days later, on May 17, 2020, he met in the Pod 2A interview room with Lt. Shannon for about 15 minutes, and Peace accepted his discipline.  *Id*.  at 116:14-25, 117:2-118:24.

8

Peace testified he had an opportunity at that meeting to explain from his perspective what happened and an opportunity to invite witnesses.  *Id*. at 118:18-119:11.  For assistance with the discipline process (to understand the process or what his rights were), Peace knew that he could have contacted Prisoner Legal Services, but he did not.  *Id*. at 32:14-33:17.  He was told after the hearing what discipline would be imposed.  *Id*. at 68:8-16; 69:9-16.

CJ-3, where Peace was an inmate, has a policy and procedure for inmate discipline that requires the following: completion of a RFD within 24 hours of the incident by the charging employee, submission and review of the RFD by a supervisor, issuance of the RFD to the inmate and delivery to the inmate within 24 hours of the incident, an investigatory hearing and a summary of the hearing on the hearing disposition form.  Collins Decl. ¶ 4, Ex. A (Custody Division Policy and Procedure or "CODM" 7.03) at 3-4.  Importantly, the procedure provides the following:

i.   The Investigatory Hearing shall include an interview of the inmate charged with violating the Inmate Rules of Conduct.

ii.   In the event that an inmate states that his/her defense can be corroborated by a third-party witness, the supervisor may attempt to interview the witness.

Collins Decl., Ex. A at 4.  In addition, the procedure provides that if any part of the RFD is sustained, "the Sentencing Guidelines will be used to determine if any aggravating and/or mitigating circumstances were present and determine which, if any, discipline will be imposed."  *Id*.  The supervisor must also provide the inmate with a hearing disposition form and, upon request, a grievance form to appeal and document the results of the investigatory hearing on the inmate's Housing Activity Card and record it in the Jail Management System.  *Id*.  As further explained in detail below, Peace was provided with notice of the RFD, given a hearing with prior notice, and offered an opportunity to present his version of events and witnesses.  Collins Decl. ¶ 5, Ex. B (Peace RFD).  He was also provided with a copy of the disposition and discipline imposed.  *Id*.

### 3.   Peace's Grievances

#### a.   SFSO's Search of Peace's Grievances Related to the May 15, 2020 Incident

SFSO has had a written grievance process in place for many years.  Cauteruccio Decl. ¶ 2,

Ex. A (CODM 7.19 Prisoner Grievances).  Pursuant to this policy, which is made available to inmates: grievances must be filed within 14 days of the incident; if an inmate does not receive a response to a grievance, the inmate is to assume all administrative remedies have been exhausted; and when grievances are collected, they are turned into the Watch Commander and logged.  *Id.*. ¶¶ 3-6, Ex. A at 2-3 (¶¶ I.G & II.C).  Peace testified he was familiar with the written grievance process, and that assistance is available to inmates with the process.  Schroeder Decl., Ex. C at 25:8-15; *see also* Cauteruccio Decl. ¶ 5.  Inmate grievance forms and appeals submitted to SFSO are stored in the relevant jail facilities.  Cauteruccio Decl. ¶ 7.

SFSO performed a thorough search for grievances or appeals filed by Peace for 2020.  *Id.* ¶ 8.  No record of a grievance related to the May 15, 2020 incident was found.  *Id.*  ¶¶ 8, 9.

### b.  Peace's Testimony and Discovery Responses Relating to His Grievances

As mentioned, Peace testified he submitted four grievances relating to the May 15, 2020 incident.  Schroeder Decl., Ex. C at 70:12-24, 71:11-72:5.  Peace also testified that the triplicate grievance form allowed him to retain the pink copy whenever he submitted a grievance.  *Id.* 25:3-26:25.

In response to discovery, Peace produced copies of two grievance forms.  Schroeder Decl., Ex. D (Grievances dated 5/17/2020 and 5/24/2020).  The grievance form is a triplicate form; when an inmate submits a grievance form, the inmate retains the pink carbon copy for his records and the other two pages of the triplicate form are turned in to SFSO staff for review.  Cauteruccio Decl. ¶ 6. The grievance forms produced by Peace have a deputy star number on them, but no log number. Schroeder Decl., Ex. D at 7, 8.  Both grievances mention the May 15, 2020 incident, but none of the legible portions mentions the request for discipline or the hearing process.  *Id.*  Nor does either grievance have either a staff member's or  supervisor's response.  *Id.*

In deposition, Peace testified he completed four grievances and that all four were picked up by deputies from his cell but he only received a response to one of them.  Schroeder Decl., Ex. C at 70:12-24, 72:14-73:17, 74:18-22.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at the San Francisco County Jail in San Francisco County, which is located within the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the moving party is entitled to a

1    judgment as a matter of law." *Celotex*, 477 U.S. at 323.

2         Only admissible evidence may be considered in ruling on a motion for summary judgment.

3    *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).  Submitted by defendants in support of the

4    motion for summary judgment are declarations by Deputy Wu and Captain Tilton, a declaration by

5    defendants' counsel, and various declarations by SFSO staff: Sergeant Luigi Cauteruccio (Custodian

6    of Records); Lieutenant Arlisa Collins; Jail Health Services Medical Records Clerk Colette Costello;

7    Deputy King; and Captain John Ramirez.   Dkt Nos. 17-2 - 17-26.   Defendants attach to their

8    declarations copies of Peace's medical records, the security footage from the date and time of the

9    incident from SFSO county jail, incident reports from the date and time of the incident, portions of

10   Peace's deposition, and his responses to defendants' discovery requests.  *Id*.  Meanwhile, Peace has

11   filed his complaint (Dkt. No. 1) and his opposition to defendants' motion (Dkt. No. 22), which were

12   both signed under penalty of perjury.   The court will construe these filings as affidavits under

13   Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth

14   specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11

15   (9th Cir. 1995).

16

17                                          **DISCUSSION**

18        A.    Exhaustion

19         As of April 3, 2014, under the law of the circuit, in the rare event that a failure to exhaust is

20   clear on the face of the complaint, the defendants may move for dismissal under Rule 12(b)(6) as

21   opposed to the previous practice of moving under an unenumerated Rule 12(b) motion.  *Albino v.*

22   *Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc) (overruling *Wyatt v. Terhune*, 315 F.3d 1108,

23   1119 (9th Cir. 2003), which held that failure to exhaust available administrative remedies under the

24   PLRA, should be raised by a defendant as an unenumerated Rule 12(b) motion).   Otherwise if a

25   failure to exhaust is not clear on the face of the complaint, the defendants must produce evidence

26   proving failure to exhaust in a motion for summary judgment under Rule 56.  *Id.*  If undisputed

27   evidence viewed in the light most favorable to the plaintiff shows a failure to exhaust, the defendants

28   are entitled to summary judgment under Rule 56.  *Id.*  But if material facts are disputed, summary

United States District Court
Northern District of California

1    judgment should be denied and the district judge rather than a jury should determine the facts in a

2    preliminary proceeding.  *Id.* at 1168.

3         Further, under *Albino*, "a defendant must first prove that there was an available

4    administrative remedy and that the prisoner did not exhaust that available remedy."  *Williams v.*

5    *Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).  The burden then shifts to the plaintiff, "who must

6    show that there is something particular in his case that made the existing and generally available

7    administrative remedies effectively unavailable to him by 'showing that the local remedies were

8    ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'"  *Id.*  Affirmative acts

9    by prison officials that disrupt or prevent the exhaustion of administrative remedies may make

10   administrative remedies effectively unavailable.  *Nunez v. Duncan*, 591 F.3d 1217, 1224-25 (9th

11   Cir. 2010).  The ultimate burden of proof, however, remains with the defendants, and the evidence

12   must be viewed in the light most favorable to the plaintiff.  *Paramo*, 775 F.3d at 1191.

13        Here, in the instant motion for summary judgment, defendants argue that Peace's claims

14   should be barred for failure to exhaust administrative remedies because "these is no credible

15   evidence that he submitted any grievances related to the May 15, 2020 incident."  Dkt. No. 17 at 18.

16        As mentioned above, Peace has testified in his deposition that he submitted four grievances

17   related to the May 15, 2020 incident, but he claimed that he "wasn't getting no responses to the

18   grievances that [he] wrote."  Schroeder Decl., Ex. C at 71:18 - 72:5.  Peace added that he got a

19   response to one of his grievances (though he does not remember which one) and "nothing ever

20   happened after that."  *Id.* at 74:20-24.  Peace mentioned that the response he received stated that

21   "Captain Tilton said he talked to his deputy about his behavior."  Dkt. No. 1 at 1.  Peace appealed,

22   but he claims that he "still ha[s] not got[ten] a response almost a year later."  *Id.*  Pursuant to CODM

23   7.29, if an inmate does not receive a response to a grievance within thirty days, the inmate is to

24   assume all administrative remedies have been exhausted.  Cauteruccio Decl. ¶ 4, Ex. A at 2 (¶ I.G).

25   Thus, it seems that Peace is claiming that he assumed he exhausted his administrative remedies

26   because he did not receive a response within thirty days.  *See id.*

27        Defendants dispute this and argue that Peace's testimony that he submitted four grievances

28   related to the May 15, 2020 incident is "not credible" because Peace "only produced two grievance

United States District Court
Northern District of California

forms, one of which is illegible." Dkt. No. 17 at 18-19 (citing Schroeder Decl., Ex. D (Peace's Discovery Responses). Defendants also argue that "there is a requirement and process for logging grievances at the facility where [Peace] is housed, and yet a thorough search did not locate any of the alleged grievances related to the May 15, 2020 incident. *Id.* at 19 (citing Cauteruccio Decl. ¶¶ 3, 7-9).

With regard to the first step of the *Albino* burden shifting test, defendants have sufficiently shown the existence of an available administrative remedy through the jail's grievance process and that a search of the grievance records did not produce evidence that Peace properly submitted a grievance relating to the May 15, 2020 incident to all levels of review before filing the instant action. Dkt. No. 17 at 18-29 (citing Cauteruccio Decl. ¶¶ 3, 7-9). Meanwhile, as explained above, Peace has declared, under penalty of perjury, that he attempted to exhaust his administrative remedies in May 2020. Dkt. No. 1 at 1. Because he did not receive a response within thirty days, he pursued the instant suit. *Id.* Even if defendants argue that Peace's allegations are "unsupported by the record," *see* Dkt. No. 17 at 19, it seems that Peace is also claiming the grievance procedure was *unavailable* to him because jail officials did not respond to his grievances and, in essence, prevented him from being able to pursue his grievances relating to the claims at issue, *see* Dkt. No. 1 at 1; Dkt. No. 22 at 1. The record also shows that Peace has produced copies of two of the four grievances relating to the May 15, 2020 incident, which are dated May 17, 2020 and May 24, 2020. *See* Schroeder Decl., Ex. D (Grievances dated 5/17/2020 and 5/24/2020). Upon shifting the burden to Peace and viewing the evidence in the light most favorable to him, the court finds that he has sufficiently demonstrated that the prison's administrative remedies were "effectively unavailable" to him. *Paramo*, 775 F.3d at 1191-92 (finding that the prisoner's statements that she was thwarted from filing grievance was sufficient to meet her burden of production in showing that administrative remedies were not available to her); *see also Nunez*, 591 F.3d at 1224.

In contrast, the evidence produced by the defendants—the absence of any grievance alleging Peace's claims stemming from the May 15, 2020 incident—is insufficient to carry their ultimate burden of proof in light of Peace's verified factual allegations. *See Paramo*, 775 F.3d at 1192 (finding that the declaration submitted by defendant did "nothing to rebut [the plaintiff]'s evidence

United States District Court
Northern District of California

that administrative remedies were not available to her at the time she tried to file the relevant grievance and appeal in this case").

Finally, as mentioned above defendants' main argument is that Peace's allegations—relating to the exhaustion of his administrative remedies—are not credible.  Dkt. No. 17 at 18-19.  It is not the province of the court on a summary judgment motion to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  At this juncture, Peace's evidence that he attempted to file four grievances but was thwarted from exhausting is sufficient to defeat defendants' motion for summary judgment.  *See Nunez*, 591 F.3d at 1224.  Accordingly, defendants are not entitled to summary judgment based on the failure to exhaust administrative remedies at this time, and their motion is DENIED on this ground.

### B.   Excessive Force Claim

In the alternative, defendants argue that there is no evidence showing that their use of force was excessive under the circumstances or that Peace was injured as a result of their actions.

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment.  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).  To prove an excessive force claim under § 1983, a pretrial detainee must show only that the "force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.*  "A court (judge or jury) cannot apply this standard mechanically."  *Id.*  "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).  A court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"  *Kingsley*, 576 U.S. at 397

United States District Court
Northern District of California

(quoting *Bell*, 441 U.S. at 540, 547) (alterations in original).  Factors that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

Because the *Kingsley* standard applicable to excessive force claims by pretrial detainees is purely objective, it does not matter whether the defendant understood that the force used was excessive or intended it to be excessive.  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc).  A pretrial detainee can prevail by providing "'*objective* evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 397-98) (emphasis in original).

Defendants assert that the application of the *Kingsley* factors weighs in favor of summary judgment. Dkt. No. 17 at 20-21.  First, as to the "relationship between the need for the use of force and the amount of force used," defendants argue that Peace's refusal to comply with the officers' commands to return to his cell and to submit to handcuffing necessitated the use of force.  *Id.* Defendants specify that Deputy Wu used "reasonable, minimal force in attempting to handcuff [Peace] on May 15, 2020." *Id.* at 20.  They also point out that prior to when Deputy Wu first used force on Peace, Peace had already done the following:

> 1) ignored at least twice [Deputy] Wu's instruction to start walk time,
> 2) directed curse words at [Deputy] Wu, 3) refused a direct order to
> return to his cell, 4) turned his back three times on [Deputy] Wu while
> [Deputy] Wu was talking to him and 5) refused a direct order to
> submit to handcuffing.

*Id.* (citing Schroeder Decl., Ex. C at 75:16-76:6, 39:5-11, 44:6-50:19, 119:12-24, 50:25-53:5); Wu Decl. ¶¶ 5-10, Exs. A (Inmate Rules of Conduct) and B (Incident Report); King Decl. ¶ 4; Ramirez Decl., Exs. A (Camera 152) and B (Camera 155)).  Next, defendants claim that the "*de minimis* nature" of Peace's injuries to his lip and back (i.e., the May 15, 2020 incident caused him to bite his lip and triggered pain from a prior back injury) "demonstrates that the force used by [Deputy] Wu was minimal and not excessive as a matter of law." Dkt. No. 17 at 22.  Turning to the "severity of

United States District Court
Northern District of California

16

United States District Court
Northern District of California

the security problem at issue," defendants claim that "[b]ecause of the cheering on from inmates watching from their cells, the two inmates who approached them during the struggle and the location of this incident inside a day room surrounded by occupied cells with a clear view of the action and an ability to raise their voices and be heard, [Deputy] Wu's use of force was especially reasonable given the need to maintain order and to demonstrate to the watching inmates that such a violation of the Inmate Rules of Conduct would not be permitted." *Id.* at 21.  As to the "threat reasonably perceived by the officer," defendants argue that Deputy Wu's "use of force in this situation was objectively reasonable when judged from his perspective as a reasonable officer facing an inmate who had repeatedly disregarded direct orders and repeatedly turned his back on the deputy and who pursuant to the deputy's training and experience had displayed pre-assaultive behavior." *Id.* at 20 (citing Wu Decl. ¶ 6 ("Based on my training and experience, [Peace] (who is taller than I am) displayed a fighting stance and pre-assaultive behavior")).  Finally, as to "whether the plaintiff was actively resisting," defendants claim that Peace "physically resisted." *Id.* at 20.  They add that the "video shows [Peace] was moving his body and struggling with deputies in active resistance." *Id.* at 21.  Defendants also claim that Peace "concedes" that he resisted, *see id.* at 20, but such is not the case, as further explained below.  Defendants claim that "[g]iven all of these circumstances (which, due to the additional stresses of the pandemic involved an environment more tense than typical . . .), the force used was objectively reasonable." *Id.* at 21.  Therefore, defendants contend in their motion for summary judgment that Peace has not raised a triable issue of fact as to whether Deputy Wu used "reasonable, minimal force in attempting to handcuff [Peace] on May 15, 2020." *Id.* at 20.

As mentioned, Peace's verified complaint, which was signed under penalty of perjury, may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder*, 55 F.3d at 460 & nn.10-11.  The court on summary judgment must assume the truth of Peace's verified pleadings. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (citing *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors, Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987)).  Peace contends in his complaint that there was no provocation for Deputy Wu's use of force because he did not attempt to resist handcuffing. Dkt. No. 1 at 5.  Peace claims that he was in the process of turning around to comply

1  with Deputy Wu's order to "cuff up" when Deputy Wu "jump[ed] on [Peace's] back [and] place[d]

2  [Peace] in a headlock . . . wrestled [him] around which made [them] slam into the metal sink and

3  the wall." *Id.* Deputy Wu confirms that he "wrestle[d] [Peace] to the ground," "plac[ed] him

4  inadvertently in a headlock," and "maintained this position until Deputy King assisted [him]." Wu

5  Decl. ¶ 10.

6        Assuming the truth of Peace's allegations in his complaint, evidence produced by defendants

7  conflicts with Peace's evidence with respect to whether Peace was resistant or combative during the

8  incident such that Deputy Wu's application of force was necessary. Second, assuming some force

9  was warranted, there is a material issue of fact regarding whether Deputy Wu's force was objectively

10  reasonable. *See Kingsley*, 576 U.S. at 396-97. The parties have produced evidence that the amount

11  of force Deputy Wu used included: (1) wrestling Peace; (2) placing Peace in a headlock; and

12  (3) maintaining Peace in the headlock until Deputy King assisted in handcuffing Peace. Dkt. No. 1

13  at 5; Wu Decl. ¶ 10. A reasonable jury, drawing inferences from facts in the light most favorable to

14  Peace, could find Deputy Wu's use of force objectively unreasonable. *See id.*

15        For example, as to the relationship between the need for the use of force and the amount of

16  force used, defendants argue that Deputy Wu's use of force was "objectively reasonable" when

17  judged from his perspective as a reasonable officer on the scene facing an inmate who had

18  "repeatedly disregarded direct orders and repeatedly turned his back on the deputy and who pursuant

19  to the deputy's training and experience had displayed pre-assaultive behavior." Dkt. No. 17 at 20

20  (citing Wu Decl. ¶ 6). The problem with defendants' argument, however, is that Peace contends

21  that he complied with Deputy Wu's orders and he was in the process of submitting to handcuffs but

22  Deputy Wu grabbed Peace and "never gave [Peace] a chance to . . . turn around and cuff up . . .

23  [and] never gave [Peace] a chance to disobey that direct order." Schroeder Decl., Ex. C at 50: 3-9.

24  Taking these facts in the light most favorable to Peace, then there exists a triable issue of fact as to

25  whether the physical force use by Deputy Wu was necessary or justified.

26        As mentioned above, defendants claim that the video surveillance submitted to the court

27  supports their version of events. *See* Dkt. No. 17 at 10-11 (citing Ramirez Decl., Exs. A & B).

28  However, the court finds that after reviewing the video surveillance of the incident, neither of the

United States District Court
Northern District of California

two videos clearly shows the circumstances around the moment Deputy Wu grabbed Peace. *See* Ramirez Decl., Exs. A & B. First, the videos do not have any sound. *See id.* Also, only one video shows images of the initial struggle between Deputy Wu and Peace, but the view is from quite a distance and it is impossible to determine whether or not Peace resisted handcuffing. Ramirez Decl., Ex. A. The second video only shows the initial interaction between Deputy Wu and Peace, but both of them leave the frame once the struggle begins, and thus this second video does not contain a clear view of the struggle. *See* Ramirez Decl., Ex. B.

In sum, viewing the evidence in the light most favorable to Peace, the court finds that genuine issues of material fact remain. Assuming the truth of Peace's pleadings, evidence produced by defendants conflicts with Peace's evidence with respect to at least two questions of fact. First, a genuine issue of material fact exists regarding whether Peace was resistant or combative during the incident such that Deputy Wu's application of force was necessary. Second, assuming some force was warranted, there is a material issue of fact regarding whether Deputy Wu's force was objectively reasonable. *See Kingsley*, 576 U.S. at 396-97. A reasonable jury, drawing inferences from facts in the light most favorable to Peace, could find Deputy Wu's use of force objectively unreasonable. *See id.* The court concludes that Peace has set forth "specific facts showing that there is a genuine issue for trial" and, therefore, defendants are not entitled to summary judgment as a matter of law on the merits of his excessive force claim. *Celotex*, 477 U.S. at 324.

Defendants next argue that Peace's excessive force should fail because he did not suffer any physical injury. Dkt. No. 17 at 21-22. The statute defendants seem to rely on is 42 U.S.C. § 1997e(e), which has been construed by the Ninth Circuit to have a rather limited application.

42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." The physical injury requirement only applies to claims for *mental and emotional injuries* and does not bar an action for a violation of a constitutional right. It is unclear exactly what allegations or claim defendants challenge because Peace did not allege a separate claim in his complaint for mental or emotional injuries. *See* Dkt. No. 1 at 3. Instead, Peace stated that he seeking monetary damages. *Id.*

United States District Court
Northern District of California

In *Oliver v. Keller*, the Ninth Circuit held that section 1997e(e) does not bar claims for nominal, compensatory or punitive damages based on the violation of a constitutional right. 289 F.3d 623, 630 (9th Cir. 2002). Under *Oliver*, monetary damages would be available for a violation of a plaintiff's constitutional rights without regard to his ability to show that he was physically injured. *See id.* Here, because Peace's complaint raises a constitutional claim of excessive force, he need not allege a physical injury as a precondition to recovering monetary damages. *Id.* ("To the extent that appellant's claims for compensatory, nominal or punitive damages are premised on alleged Fourteenth Amendment violations, and not on emotional or mental distress suffered as a result of those violations, section 1997e(e) is inapplicable and those claims are not barred"). Accordingly, the court DENIES defendants' motion for summary judgment as to their argument that Peace's excessive force claim fails under section 1997e(e).

Finally, defendants argue they are entitled to qualified immunity because they allege "[t]here simply is not any evidence of any purposeful misconduct on the part of Defendants." Dkt. No. 17 at 27.

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Id.* at 232. The inquiry of whether a constitutional right was clearly established must be undertaken in light of the "specific context" of the case, not as a broad general proposition. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Pearson*, 555 U.S. at 236 (overruling *Saucier*'s requirement that qualified immunity analysis proceeds in a particular sequence). Courts may "exercise their sound discretion in deciding which

of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (alteration and omission in original) (citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

Here, summary judgment is not appropriate for defendants on a qualified immunity defense. Like their argument on the merits of the excessive force claim, defendants' qualified immunity analysis depends on an acceptance of their version of the facts. That is, only by accepting defendants' version of the facts could the court conclude that there was no Eighth Amendment violation or that no reasonable officer would have thought his conduct using force to restrain Peace was unlawful. However, the triable issue of fact as to what actually transpired May 15, 2020, precludes summary judgment for defendants on their qualified immunity defense as well as on the merits of the excessive force claim. Accordingly, defendants' motion for summary judgment as to the excessive force claim is also DENIED on their remaining alternative grounds.

### C. Due Process Claim

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects individuals against governmental deprivations of life, liberty or property without due process of law. When a pretrial detainee challenges conditions of his confinement, "the proper inquiry is whether those conditions amount to punishment," because the Due Process Clause does not permit punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Disciplinary segregation as punishment for violation of jail rules and regulations cannot be imposed without due process, i.e., without complying with the procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974). *See Mitchell v. Dupnik*,

75 F.3d 517, 523-26 (9th Cir. 1996).[6]

Not every inconvenience, restriction, disability or other unfavorable condition that occurs "during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537.  To determine whether a condition imposed on a pretrial detainee amounts to such punishment, the court looks to whether the condition is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538.  Absent a showing of an "'expressed intent to punish'" by the jailers, whether a restriction amounts to punishment generally turns on whether there is an alternative purpose to which the condition rationally may be connected, and whether the restriction then appears excessive in relation to that purpose.  *Id.* "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539.  It is not necessary that the condition be limited to ensuring that the detainee shows up at trial, as it is recognized that the government has "legitimate interests that stem from its need to manage the facility in which the individual is detained." *Id.* at 540.  For example, jailers "must be able to take steps to maintain security and order" at the jail, so restraints that are reasonably related to these goals are not, without more, unconstitutional punishment. *Id.*  Courts also must allow for the fact that considerations of jail security and order "'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'" *Id.* at 540 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)); *accord Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328 (2012).

---

[6] The procedural protections required by *Wolff* in a disciplinary proceeding include written notice, time to prepare for the hearing, a written statement of decision, allowance of witnesses and documentary evidence when not unduly hazardous, and aid to the accused where the inmate is illiterate or the issues are complex. *Wolff*, 418 U.S. at 564-67.  There also must be some evidence to support the disciplinary decision, *see Superintendent v. Hill*, 472 U.S. 445, 454 (1985), and the information that forms the basis for the disciplinary action must have some indicia of reliability. *See Cato v. Rushen*, 824 F.2d 703, 704-05 (9th Cir. 1987).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Peace alleges he was disciplined for the May 15, 2020 incident, and that Captain Tilton

2    allowed Peace to be placed in disciplinary housing for thirty days (with attendant loss of privileges)

3    without an evidentiary basis. Dkt. No. 1 at 5. In this regard, Peace alleges as follows: immediately

4    after the altercation on May 15, 2020, he was taken to an interview room where he spoke to Captain

5    Tilton and tried to explain what happened. *Id.* at 3, 5. Captain Tilton told Peace that if there was

6    any truth to what Peace was saying, Captain Tilton would see it on the Pod's camera and would

7    review it. *Id.* However, Captain Tilton let his deputies send Peace to "the hole for 30 days with

8    loss of all [Peace's] privileges." *Id.* at 3. Peace thus lost canteen and phone privileges and "walk

9    time" for thirty days. *Id.* at 5. Also, two charges related to the May 15, 2020 incident were filed

10   against Peace, but they were later dropped at the first court appearance. *Id.*; *see also* Wu Decl. ¶ 12,

11   Ex. D (Charges).

12   Defendants argue Peace's words to Captain Tilton in the Pod 2B interview room did not

13   constitute a pre-disciplinary hearing, and Captain Tilton did not initiate the request for discipline or

14   manage the pre-disciplinary hearing. Dkt. No. 17 at 24-25; *see* Tilton Decl. ¶ 7. In any event,

15   defendants argue that Peace's testimony and the evidence they submit support that "a

16   constitutionally adequate hearing was provided to [Peace]." *Id.* at 24.

17   Meanwhile, other than Peace's conclusory statements above, *see* Dkt. No. 1 at 3, 5, he has

18   presented no evidence to refute Captain Tilton's declaration that he was not involved in the decision

19   to place Peace in disciplinary housing for thirty days (with attendant loss of privileges), *see* Tilton

20   Decl. ¶ 7. Instead, the record shows that that decision was made by Lt. Shannon during the

21   investigatory hearing on May 17, 2020. *See* Collins Decl., Ex. B at CCSF-PEACE_000029-30

22   (RFD DISPO). Captain Tilton was not present at the investigatory hearing. *See id.* In making a

23   decision at the investigatory hearing, Lt. Shannon relied on the Incident Reports outlining the RFD

24   prepared by Deputies Wu and King after the incident as well as the inmate's statements at the

25   hearing. *Id.* at CCSF-PEACE_000029. It was the job of Lt. Shannon, not Captain Tilton, to consider

26   the evidence at the investigatory hearing and impose the discipline. Collins Decl. ¶ 5. Defendants

27   present evidence that during the May 17, 2020 investigatory hearing, Peace received advance written

28   notice of the charges, at least twenty-four hours of preparation time, a written statement from the

23

United States District Court
Northern District of California

1   committee explaining the basis for its decision, and the opportunity to present evidence in his

2   defense and call witnesses.  Specifically, defendants presented the existence of written notice of the

3   charges: the RFD must be issued to the inmate "showing which type of hearing shall be held and

4   will document the date and time the Notice was issued."  *See* Collins Decl., Ex. A (CODM 7.03) at

5   4 (¶ III.B.2.c.).  Second, CODM 7.03 requires that the notice be issued to the inmate within 24 hours

6   of the incident.  *Id.* at 4 (¶ III.B.2.c.i.).  Third, CODM 7.03 provides that a supervisor "will complete

7   the Summary of Hearing portion of the Hearing Disposition form" and will provide a copy of the

8   completed Hearing Disposition form to the inmate.  *Id.* at 4 (¶ III.B.2.f, g.).  The record indicates

9   that the form provided to Peace shows that he was provided a 24-hour waiting period before the

10   hearing, and thus giving him time to prepare.  *Id.*, Ex. B (CCSF-PEACE 000029) ("Inmate Peace

11   did not waive his 24-hour waiting period.  I will conduct an investigatory hearing on May 17, 2020

12   at 1164 hours.").  Fourth, CODM 7.03 provides that the Investigatory Hearing shall "include an

13   interview of the inmate" and "[i]n the event that an inmate states that his/her defense can be

14   corroborated by a third-party witness, the supervisor may attempt to interview the witness."  *Id.*, Ex.

15   A (CODM 7.03) at 4 (¶ III.B.2.e.i, ii.).  As mentioned, Peace has not disputed this evidence.  Thus,

16   Peace received all the due process protections required by *Wolff*.

17       At the investigatory hearing, Lt. Shannon recorded Peace's statement as follows: "Peace said

18   he didn't let Deputy Wu take him to the ground.  He said Deputy Wu was unprofessional with him

19   and as a result he resisted Deputy Wu.  Peace said he is sorry for his actions and will accept his

20   discipline." Collins Decl., Ex. B at CCSF-PEACE_000029.  Lt. Shannon stated that he "concur[red]"

21   with the RFD." *Id.*  "The RFD disposition entry reflects the following discipline was imposed:

22   approximately 30 days for restricted housing and loss of visits, telephone, recreation and

23   commissary." Collins Decl. ¶ 5 (citing Ex. B at CCSF-PEACE_000030).  Thus, the record contains

24   "some evidence" to support Lt. Shannon's decision to place Peace in restricted housing with the

25   aforementioned loss of privileges.

26       Because Peace received all necessary due process protections required by *Wolff* and also

27   because "some evidence" exists to support the disciplinary decision, defendants are entitled to

28   summary judgment on the due process claim.

United States District Court
Northern District of California

Accordingly, defendants' motion for summary judgment is GRANTED as to this claim.[7]

### D.      Referral To *Pro Se* Prisoner Mediation Program

The court has granted summary judgment on Peace's due process claim, but there remains for adjudication his excessive force claim.  This case appears a good candidate for the court's *Pro Se* Prisoner Mediation Program.

Good cause appearing therefor, this case is now referred to Magistrate Judge Robert Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program.  The proceedings will take place within **one hundred twenty days** of the date this order is filed.  Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings with all interested parties and/or their representatives and, within five days after the conclusion of the proceedings, file with the court a report for the prisoner mediation or settlement proceedings.

From time to time, prisoner-plaintiffs have refused to participate in mediation and settlement proceedings.  Although the court assumes that will not occur in this case, the court wants to make clear the consequences if it does.  Judicial resources are consumed preparing for mediation and settlement conferences, and those resources are wasted when a scheduled conference does not proceed.  To avoid that happening, Peace is now specifically ordered to attend and participate in the mediation or settlement conference proceedings.  He does not have to reach a settlement or other resolution of his claims, but he absolutely must attend and participate in all the mediation or settlement conference proceedings.  The conference may be set up so that he will appear in person, by videoconference or by telephone—and he must attend whatever format Magistrate Judge Illman chooses.

Peace is cautioned that he may be sanctioned for failure to comply with an order to participate in a settlement conference, and such sanctions may include dismissal of part or all of the action.  *See* Fed. R. Civ. P. 16(a), (f), and 41(b).

---

[7] Because the court has found that Peace's due process claim fails on the merits, defendants' alternative arguments as to Peace's failure to exhaust this claim or Captain Tilton's entitlement to qualified immunity need not be reached.

1

2                                        **CONCLUSION**

3         For the foregoing reasons, the court orders as follows:

4         1.       Defendants' motion for summary judgment is **GRANTED IN PART** as to Peace's

5  due process claim and **DENIED IN PART** as to his excessive force claim.  Dkt. No. 17.

6         2.       Deputy Wu is not entitled to summary judgment in his favor on Peace's excessive

7  force claim.

8         3.       Captain Tilton is entitled to summary judgment on Peace's due process claim.  When

9  a final judgment is entered, it will include a judgment in favor of Captain Tilton and against Peace.

10        4.       This action is now referred to Magistrate Judge Illman for mediation or settlement

11 proceedings pursuant to the *Pro Se* Prisoner Mediation Program.  The clerk will provide a copy of

12 this order to Magistrate Judge Illman.

13        5.       If this matter does not settle, then this case will proceed to trial.

14        6.       Peace's "Motion to Reconsider" is DENIED as premature.  Dkt. No. 23.  To the

15 extent that Peace's motion can be construed as a request for an extension of time to file his

16 opposition, such a request is GRANTED.  The time in which Peace may file his opposition will be

17 extended *nunc pro tunc* to August 1, 2022, the date that his opposition was filed.

18        7.       This Order terminates Docket Nos. 17 and 23.

19        **IT IS SO ORDERED.**

20 Dated: September 13, 2022

21

22                                                _____

23                                                SUSAN ILLSTON
                                                 United States District Judge
24

25

26

27

28